Comeshak v. Zurich Services May it please the Court of Counsel, Your Honor, I don't mean this to look like Groundhog Day. I'm going to try to cover some different things, things that I think reinforce the points I argued before, and which demonstrate that the order of Comeshak was every bit as the Robinson order was, an abuse of the trial court's discretion, a fundamental error of law. I'm going to set my watch here so that I don't go over. The predominant standard in the Comeshak was not met, it cannot be met, and that's apparent by looking at the record. The trial of Dr. Comeshak's claims was simply not established liability to any other class member. Now, Dawn Robinson is a member of the Comeshak class, the certified class of Comeshak, and Comeshak is a member of the Robinson class by the definition of those two certified classes. I submit neither can be certified, but those are the facts. One is in the other, and vice versa. There are differences between their two theories, and there are differences between the facts in those cases, and those differences reinforce why the certification order here wasn't here. I note, too, that the court in Comeshak certified an 11th state class. I'll cover in detail later, but that was an overreach of the highest order. It is fundamentally irretrievable, inconsistent with Avery and inconsistent with good jurisprudence in this state. Let me turn now to the record evidence, the evidence that I said would be important in thinking about these claims and in demonstrating why they're individual. Dr. Comeshak treated the insured, a gentleman, Terry Crown, 16 times, 16 times prior to the car accident for which he had insurance coverage. He had an injury down, he was bothered by a problem, he was mad. After the accident, he continued to receive treatment for Dr. Comeshak in the same area, and it was billed under the exact same code, the code that doctors use to communicate to insurance companies about what service was rendered, the exact same code. When Dr. Comeshak was treating Terry Crown before the car accident, he charged him $34 or $40 for those treatments, $34 or $40. Illinois Farmers shows up on the scene, and now there's the auto accident. Does Dr. Comeshak charge $34? No. Does he charge $40? No. What does he charge? $57.50. Within a period of a week, there are multiple different charges for a procedure which is identically coded the same on the bill submitted to the insurance company. Has he been deposed in this matter? He has been, Your Honor. And what was his explanation? Was that a question? It was, Your Honor. He had, I would submit, he had no sensible explanation. He said, well, maybe they took less time. That's not reflected in what he sent in. Okay? It's not reflected in what he sent in. But he did have some explanation. He did? It's an individual one. It only applies to him. It says nothing about Ms. Robinson or anybody else. Some of the Dr. Comeshak charges were reviewed by Zurich. A recommendation was made to pay at the 90th, and that recommendation was followed. Other charges, there was a recommendation to reduce. Recommendation not followed. Overridden, Dr. Comeshak paid in full for certain of the other charges. So, again, the notion that it's all a computer. Mr. Burke said we paid not a penny more. The record refutes it. Both case records refute it. We asked him, why do you think his charges were reasonable? He gave a whole series of subjective factors, as he's surely entitled to do. That's his view. But ultimately he said, reasonable is what I charge. That's the definition of it. If I charge it, it's reasonable by definition. Well, what do we know about what Dr. Comeshak's practices are? Well, we know that he generally accepts discounts of between 10 percent and 60 percent off, depending on who the payer is. That's in the record, at $34.92 to $93. So this doctor may bill a standard amount, but accepts a vastly different array of charges as payment in full from different providers. Now, I submit there's no legitimate reason that Illinois Farmers should be the only one that has to pay his full bill of charges. But that's what the theory of the case seems to be, that he can accept less from others, he can charge less even to this plan for what appears to be the same service, but Illinois Farmers pays the full freight, and we're the only one that doesn't. And on top of that, we don't even get to present an explanation, a defense, why it was that we determined his charge for that service was unreasonable. I submit the theory that they have in mind is not really a trial. It's not a trial that comports with due process. It's much more of an execution. Now, let's talk about the contract claim here, because it's different. Mr. Berg talks about process, but then tells the court not to actually look at the result of the process. What did Illinois Farmers pay? Dr. Komachek says don't look at what Illinois Farmers paid. He, too, wants to keep out all evidence of what Illinois Farmers paid and all evidence about the treatments rendered and all evidence about what Dr. Komachek accepts from other people. He wants the case to be decided summarily because he asserts there's an ambiguity in the insurance policy. That's the argument in the papers before the court at great length. In fact, his theory is it doesn't matter if the jury would think on reviewing the evidence that Illinois Farmers made a good decision or a bad decision, that it paid the right amount or the wrong amount in the jury's mind. He says the jury doesn't get to make any decision whatsoever. Everything has to be paid in full, ipso facto. Well, what's usual and customary in Illinois, we already know that. I've covered that. I'm not going to repeat myself. There's case law. There's precedent on that point. I've addressed it before to the court. The court uses it. The court itself uses the term usual and customary. Precedent versus precedent amore. This court knows what those words mean. It's fact specific. The legislature uses these words, and the Department of Insurance uses these words. That's all in our record. The one thing all those references to those words have in common is an application. It's a fact specific question. That's the one thing all those cases and references have in common. I submit that the rule that you need to look at medical expenses individually is proven by Dr. Komischeck's facts, the record in his case. I might say he says he understands what usual and customary means. He says F2694 means the average. That's what he says it means. So the ambiguity argument has already been refuted by the name to claim. But leave that aside. What does the evidence show about Dr. Komischeck and what's reasonable? Different charges, three different charges within a week. Vastly different charges from Dawn Robinson's. They're only five miles apart. Vastly different rates. Excuse me. Did you look at those things in determining how much to pay? Did your insurance company look at the ---- No. No, you didn't. The insurance company did two things. We looked at the recommendation from Zurich, Your Honor, and the claim representative then reviewed the bill and made an independent judgment about what to pay. But you did all of that without making any individual determination of this doctor's practice or his prior billing, which you're requiring him to do to prove it. Your Honor, I'm not requiring him to do that. I submit the case law in our state about what is the usual and customary charges. That's what requires him to do it. Okay. He regularly accepts less. He regularly accepts less than his full amount of charge. I'm not saying, Your Honor, that we were necessarily right. I don't need to argue that. That's the wrong question. My point is you've got to look closely. And if you're going to let it, if there is going to be a trial, if there's going to be a trial process, the jury has to make a decision, and it needs evidence to do that. That evidence will be necessarily individual. Let's talk about the multistate certification for a minute. The Court throws all caution and all comedy to the wind in certifying the multistate class. I'll start with the California case, which we cite, Partners in Insurance Exchange cases. Under the laws of the state of California, this case can't be certified under California law. Why? Because as a matter of California law, it's an individual question whether or not farmers complied with and satisfied its obligation to pay usual and customary charges. The California court denies certification of the group of this class that is certified here. I submit that is the best and perhaps most egregious example of how the certification is simply an overreach. It is inconsistent with Avery, which says you can certify a multistate class, maybe, but for everything it better be the same. It's not. It's fundamentally different. Now, let's talk about reasonableness. We know because there's case law in the states. In Alabama, the question of what is reasonable, the answer to that has been provided by the state Supreme Court. You need to look at the circumstances of the bill, the charges, the service, what willing customers pay, what the hospital charges others, what providers accept. You have to look at all these things under Alabama law. I submit that no Alabama court would have certified the claims of Alabama residents, but yet that's what this court does here. The North Carolina policy is different than the Illinois policy. The language is not the same. It says that farmers will pay an amount that's consistent with the usual fees charged by the majority of medical providers. Well, that's different from what the Illinois policy says. It doesn't say that. And whether there's something ambiguous about those terms under North Carolina law, that really is a question for the North Carolina court. And let me talk about a final example because I think it proves the point as if further proof were needed. The court certifies a class of Virginia residents. Well, let's talk about the Virginia policy. It says that we'll pay medical benefits in accordance with a couple of statutes. It refers to statutes enacted by the Virginia legislature. The statutes themselves refer to the terms reasonable and necessary expenses. If there's something ambiguous about those statutes under Virginia law, that's a question for the Virginia legislature, for the Virginia courts, for somebody in Virginia to decide. Deciding Homeshack's case doesn't implicate that statute, and it's wrong for the court to interject and to reach out to take jurisdiction of problems that really are properly the problems of others. And I submit the certification here is an extreme overreach and abusive of the court's certification rights and responsibilities. The court barely mentions the consumer fraud act. It truly barely mentions it. You can read the opinion. You have no clue why the trial court certified the consumer fraud act. There's a trilogy of recent Illinois Supreme Court cases, Avery, Barber Sales, and DuBose. They're dispositive. They answer the important questions before the court on what are the proper standards and how should they be applied. Does the court refer to one of those decisions in its discussion of the consumer fraud act claim? No. Two points I'd like to make to start. Under Avery and under the Greenberger case, which I just cited, the Homeshack claim is we committed consumer fraud by not paying what he claims to be reasonable medical expenses. That's a contractual promise. Avery says that that is not actionable as a consumer fraud claim. And Greenberger, the Greenberger case is exactly spot on here because in Greenberger the claim was, ah, the consumer fraud was this claim's adjusting software. That was the instrument of the fraud. You hear the same thing here. The problem was that the MedData system is flawed in some way. The court in Greenberger says, no, no, not so fast. All you're doing is dressing up your breach of contract in language of fraud. That claim cannot stand as an independent cause of action under it, but it's barred as a matter of law. Now, I submit the certification here ignored that principle. And it secondly ignored the principle that deception and proximate causation are individual questions. Those questions are necessarily individual. Robinson's theory of deception was the insurance policy contained a deceptive communication. But the insurer, there's no information that the insurer knew anything about that clause. In Komischeck, the claim is the insurer was deceived by the explanation of review, by the document that accompanied the payment. We asked the insurer, what did you think about this? Do you remember seeing it? No, I have no recollection at all. It didn't affect me one bit. Again, Komischeck's before you as an assinee. He's before the court as an assinee. If the explanation of review didn't deceive the insurer here, Terry Crown, there's no claim under the Consumer Fraud Act, I submit. Let's talk about Komischeck. If Komischeck has an independent theory under the Consumer Fraud Act, we asked him about the explanation of review. You would think he said, oh, I was deceived terribly. I was terribly deceived. That's not what he said. His only beef with the explanation of review was he was subjective in his words. He didn't testify to any deception. He didn't say he misunderstood. That's not what he said. He said the word appear is subjective and reasonable is subjective. The point here, again, I'm not trying to prove or disprove Komischeck's case. The problem is testimony like that is informative to the court on what the trial would look like in actual fact. Would there be witnesses? Would there be testimony? Would we need to look at documents to determine if there was deception and causation? And I submit the court would. A fair trial would require that evidence that would be essential to a jury's determination. Thank you very much, Roberts. May it please the court. Alyssa Ryder on behalf of Appellant Zurich Services Corporation. In my very few minutes I have this morning to address the court, I just wanted to make sure that we don't get distracted into the same errors and mistakes that were made in the proceedings below and in the order on review, which is to lose sight of the fact that there are distinct claims being made here, the breach of contract versus the IFPA and conspiracy claims, and that there are two different sets of defendants, namely my client ZSC, which is situated differently. And for all the reasons discussed by Mr. Hack this morning, we agree that the order on review is an abuse of discretion and that a class should not be certified, but the issues are even more pointed, more pronounced when it comes to ZSC. The order does not explain what common predominating question there truly is as to these fraud claims. The most that there is is a conclusion that on page three of the order, quote, there are common issues regarding whether the use of the computer percentiles is an unfair or a deceptive practice, et cetera. Well, it doesn't explain to us what the common questions of fact or law are that are involved in that question, how it would predominate the trial. And if you look at the proceedings below, at the transcripts, at the arguments in the briefs on appeal, we get no further insight as to what those supposedly common predominating questions are, which we need in order to certify these fraud claims. The complaint alleged that there was a scheme to improperly reduce payments, but that's not really the theory anymore, and it's undisputed that ZSC did not reduce any payments. It merely issued recommendations and farmers decided that. Your client is you use the metadata information to come up with what would be a reasonable amount of a medical bill. Is that correct? Essentially. We're an outside service vendor. We don't create the software. We lease the software from another company who created the software, and we simply are an administrative service that runs the software program and then issues electronically this information to farmers recommending a reduction or not based on a particular code or finding from the software. And within the business, this is an accepted way of determining the reasonableness of a bill. Is that correct? Well, I believe so. Would you think that that would be admissible in a court of law to prove reasonableness, this expert analysis? I'm sorry, I'm not following your question. If I wanted to prove the reasonableness of a bill, could I use your procedure to do it? I think that would be a relevant piece of evidence as to whether a charge was reasonable or not. Whether it was the insurance company or the plaintiff in this case? I think it would likely be, yes, a piece of relevant evidence, whether it would answer any common question. So there's more than one way to prove the reasonableness of a bill, individual testimony or expert testimony across the field? Well, whether it is reasonable to use this sort of software in order to review bills, that testimony would be relevant, but that wouldn't answer whether any one particular charge in any one individual case was reasonable in fact or not, or whether a reduction was in fact reasonable or not, for the reasons that Mr. Heck was stating earlier. Well, if it's less than the reasonable amount and it is medically necessary, why wouldn't that prove that it should have been paid? Well, I'll withdraw. You go ahead. You go ahead. I apologize. I'm using up too much of your time. Go ahead. But this exchange, I think, segues into the point that I was making, which is that the case has been consumed with this question of reasonableness, which is really this breach of contract question, and it can distract us from the questions, the many individual questions that are inherent in the consumer fraud and conspiracy claims, which are whether there was any deceptive act or practice that actually proximately caused damages to any one of these named plaintiffs, and then there has to be some misrepresentation or omission by the defendant. And still we have no idea what omission or misrepresentation ZSC could have made, since it had no contract with the plaintiffs or the plaintiff's assignors. It had no contractual obligation. It didn't issue the EOR that's at issue. Does Zurich even know what farmers paid based upon Zurich's recommendation? I'm not sure if the record makes that clear. I think what the record shows is that once the recommendation was made and sent to farmers, it was up to farmers' representatives to individually assess whether they would issue the EOR as it was proffered, and they could override it. And I don't think, but I'm not 100% certain, but I think that the record shows that the ZSC person would not know, in fact, what farmers did on its end before it issued the statement. We ask that you overturn the order. Mr. Piper, is that right? Yes. Good morning, Your Honors. I'm Jonathan Piper, and Co-Counsel Robert Sprague is here today for the plaintiffs and the class. As you've said, there's a number of these cases. We've been over these issues. Rather than belabor the points, I'd like to make two key points and then focus on the issues that have been discussed in the discussion today. First of all, the bill review case against farmers in Zurich that's up here today, two appellate courts have affirmed certification of this very case, one in Oregon and one in Oklahoma, against these defendants. That's cited in our briefs. There's a strong case in Oregon and in Oklahoma. There's a case called Farmers Med Pay. In Oregon, isn't there a statutory presumption that whatever is submitted is reasonable? There is in Oregon, and when I get into it, I will argue that that presumption exists as a matter of insurance law because this is a limitation of coverage in every state. Oregon just statutorily codifies what the insurance law is. But that, I also want to emphasize, and I'll get into it, that is not the issue here. And this is where I disagree with something you said. Judge Locono did not prejudge what this means. He did not say the plaintiffs are right, I'm going to give the doctors whatever they bill. He said that is a marriage issue. That is a question that has to come after class certification. The point is that issue is common to every one of these class members. Whatever this contract language means, it means the same thing for every class member. And the next thing that has to happen is to figure out how does the court want to construe this, but it hasn't done that yet. He could decide they're right, it means the 90th percentile of the MedData database. He could decide we're right, but it means what the doctor billed, unless they come up with some other evidence. He could decide we're going to import the court law definition of reasonableness. He could decide we're going to import the workers' comp definition of reasonableness. I thought his argument included those over 90%, though, right? Right, but not because that's automatically reasonable or unreasonable, just because that's a different percentile. It's a different percentile, so it might be an individual issue as to exactly what percentile is the correct one. But if you look at page 7, I think it's page 7, it's in the record, it's A007. He says, at this point, the issue of how damages would be approved depends in part on how the policy language is construed. Resolution of these issues is a merits issue which the court should not prejudge at the class certification stage. Plaintiffs proffer that this can be susceptible to formulaic resolution on actual bill charges or to expert damage calculation based on a statistical analysis. So the two ways you were talking about, yes, we think once the court tells us how we've got to prove this, we think we could prove it by either of those. If the court wants to say it's unmanageable as a class action to resolve each class member's specific charges, then there are other things you could do. You could either have an aggregate damages, which would be distributed to the class, or you could even break it down for ancillary proceedings. You know, you could want – sometimes in a tort case, even, all the doctor has to say is, I know what other people charge and my charges are reasonable. He's met his burden. You could have everybody submit a postcard that says under penalty of perjury, that's my opinion. But you wouldn't get to cross-examine the postcard. Well, if they want to cross-examine each other, that would be a possibility at that point. Maybe it should be remanded to small claims court at that point as individual cases. But the point I want to emphasize is because I think you were thinking that Judge Locono had already bought our reading of the contract. And he expressly didn't do that because he's not supposed to do that right now. All he's supposed to do right now is say, to figure out what the contract means, is that the same issue for each of these class members? And obviously, what this form, pre-printed, state-approved contract means is the same issue for each policyholder or their assignee. I think he bought into your argument that to prove reasonable, the amount of the bill is admissible. He just bought into the fact that that was an argument we were making, which was one that we would make later on. He would have to consider that along. It seems to be key to his certification. Paragraph C says, members of the class received or were tendered payment in an amount less than the submitted medical expenses. That only means that they're the ones that can come into court. In other words, you have to have the reduction in order to come into court and claim the reduction was wrong. He's not assuming that they are – proving you're a member of a class is not the same as proving you're able to get a recovery. So say you've got a class of everybody that bought the Big Mac Royale at McDonald's under some discount they were offering. Proving that you bought the Big Mac doesn't prove that it was wrong, but they sold it to you. You're just proving that you're a member of the class that's coming into court. That does not get you to a right of recovery. So he's saying he's not going to let anybody in his case who didn't get a close RC40 discount. That doesn't mean that there's something necessarily wrong with this. Do I – am I – maybe I'm – I just can't get – you know, it seems key to how you're presenting your case that you're just going to put the medical bill in and you feel that's going to be sufficient to get you through your case in chief. And I think – to me it seems that's the way he's thinking too. Now, if you're willing to take on their experts and say that you've already excluded everybody above the 90th percentile out of your class. If that's what Judge Locono decides, I don't think he's made the decision. I think that's wide open. They can come in with their experts. We can come – the first question is, is there a plain meaning of what reasonable means? In other words, as a matter of insurance policy construction, does this language have a plain meaning that's obvious to everybody as to what they're supposed to pay? And if so, what is that plain meaning? As a trial judge, you try to determine whether it's going to be a class. You're going to look at how the evidence is going to be submitted and whether you're going to be able to handle it or not. And so reasonableness, who's got the burden of proof first off in your case, and what are you going to have to do to prove that? And if we don't believe you can do it by presenting the face amount of the bill, I don't see where it was shown to Judge Locono that you were prepared to do something else. Well, on page 7 of the order, he says that we could do it based on either the actual bill charges or expert damage calculation, that that's what we offered, and that he's open to that as a possibility, but it might not be possible. But he said you could do it based on actual bill charges, and that has to be – I would think that's a central factor in why he certified the class. He accepted your argument or bought into your argument. No, because he could certify the case just to resolve the issue of what does this policy language mean. And you don't even have to look at any of the bills to get that far. That's what I'm trying to say is the first step is what does this contract that everybody in the class has a copy of, what does it mean? If it means what I'm saying, then we've got a pretty easy trial. If it means what the computer said, then they win and we don't even need a trial because they get summary judgment. If it means the mandated data system. If it means what we say, then we go based on the bills, and maybe they can rebuff some of them if there's some outliers. If it means court law and you've got to bring in three witnesses for each plaintiff to testify about medical expenses in the county, well, then maybe it's going to have to go to small claims court, or maybe we need to bring in an expert that would testify about an aggregate. Did you mean the class was certified to determine if the contract was ambiguous? Well, he certified it saying at a minimum we're going to have to resolve that and then see what comes after. That's exactly what it says. The issue how damage is proved depends on how the contract is construed. That's a merits issue. We're not going to prejudge it. Plaintiffs say here's how they want to do it. The defendants have yet to proffer what they think this contract really means because they know the definition. They're in a past 22, by the way. They can say, well, obviously everybody knows when they see the word reasonable, they know that that means 90th percentile of a med database. What could be plainer than that? Or they can say, well, it means you have to look at where you went to chiropractic college and how long you've been practicing and what your tax rate is and all that stuff, and then it's uncertifiable. Oops, that's not what we did, but it stops you from certifying the class. But they won't come forward and say the plain meaning of this language is X or it's Y or it's Z. They sort of, well, it's kind of the 90th percentile of a med data when we're talking about liability, but it's this multi-factor thing when we're talking about class certification. Well, that's sort of what the judge is saying is next up is these guys have to come forward and explain what they think their obligation was and stick to it. And unless they can come up with a better definition than we do or the judge comes up with a better one, then we ought to win that stage and then we can move on to a pretty easy trial. They could win summary judgment at that stage and the judge says it's the med data database. He could say I'm splitting the difference and it's the tort definition and maybe we can't try this or you've got to come up with a better trial plan. That's all down the road, though. That's something that will happen at the next stage of the proceedings pre-trial. I mean, as far as their database goes, there's also a sort of dollar liability issue. Our position would be their database recommendations are rank hearsay that has no scientific validity whatsoever. There's no scientific validity to their statistics. They don't have any evidence to come in at this point to explain why they didn't pay the full bill. And our argument would be that if they didn't do it in the adjusting process, they can't now come in and try to readjust the claim based on taking massive discovery that they could have asked for in that paragraph that Mr. Burke quoted about how we can ask for your medical records if we want to challenge your bill. If they didn't do that, then they just cut the bill and they're sort of stuck with the basis that they used when they cut it. It didn't cost much today, but in one of the other cases, Your Honor was asking about the conflict issue. And I'd just like to point out the two that were certified against them were classes strictly of insured patients. So there's no conflict. There's classes that are just the patients saying, hey, we want to get paid in full. In this case, it's the patients plus if they've assigned their rights to the providers. But in fact, the patients, we've done cases where the patient was class rep. We've done providers, and there is no conflict. Have you done any analysis of the jurisprudence in these 11 states regarding assignments, whether or not the law of assignments in all these states is compatible? Yes. And would that present any potential problem with the commonality issue there? No. We presented a survey of law and insurance contract instruction and also the assignment issue we addressed. But I would also point out this. It is not part of the case in chief. The assignment goes to not liability, but it goes to who is the class member. Is it the patient or is it the provider? And the law is that there may be sort of marginal issues about who the class members are that have to get resolved once you get the judgment. But that is not part of your case in chief. I was thinking more particularly on are there any states that say an assignment, assuming all these are valid assignments in various states, that you just assign the total cause of action, or some states may interpret these types of assignments as only assigning the rights to proceeds, whatever they may be, and not the cause of action. Are there any structural differences? There are not any structural differences like that. There are some states where there's discrepancies over what sort of magic, which make a valid assignment of benefits. All of them, if it's a valid assignment, would allow the providers to maintain the total cause of action. Right. And ultimately the insurer owes the provider the money anyway. So the only real issue is you got a judgment for the class, and then the insurer and the provider had a dispute about who should get the money. They'd have to have a valid assignment in order to be a plaintiff, wouldn't they? To establish their right to recover. Right. So at the end of the day, once the judgment's over, you don't figure out every single member of the class before you've got the judgment finalized. And then if you have to distribute money, you figure out who gets it, the acclaimed process. You can do it based on their records. Yeah, but the assignment jurisprudence in all these states have to be looked at ahead of time. Right, right. But that was done and there was no variation that precluded going forward. Zurich, you know, they're only sued on the tort claims. They kept saying, we don't have a contract with the plaintiffs. Well, that's why the rights against them were tort claims and conspiracy. But the case law, like Zinsser v. Rose, says that you can sue the vendor that provides the deceptive explanation of review. Well, if I made my point that I really don't think it's fair to say that Judge Locomo pre-judged anything other than it's a common issue for everybody what the contract means. We may have to revisit some of the trial plan issues once. But in other words, you can't go to trial unless we know how we're construing this contract. And that's next up. But first, we've got to decide that that's a common issue for everybody. Because here's what would happen otherwise. Otherwise, you get a sort of situation where I'm going to rule that the contract means the bill is sufficient. And I'm going to sort of, if he makes the judgment issue before, or I'm going to rule for the defendants that as a matter of law, Farmers wins the case. Then you send out a notice, and everybody sends it out and says, I'm not the head of this class, so I'll try it on my own. Or, yeah, I want to be a member of this class because I know I'm going to win. He can't decide the merits issues until after certification. So that's why the way he wrote it is actually very clear that he's reserving all that. And he has to reserve all that until after class certification. And the RC40 references in the class definition is to say these are the people who are in the class. Because otherwise, we'd have people that didn't even have the reduction in the class. That's not to say that they automatically win. Have you all got any questions that you'd like me to address? Because I think those are the main points I want to get on. Anything at all? Yes. Okay. Briefly, Your Honor, I'll try to be respectful and sensitive to the schedule. I know you have another argument. I submit that what Mr. Piper has done in his argument is suggest that the court can put off all the hard questions until later. And that it was perfectly fine for the trial court to certify this case with really no understanding of how the case would in fact be tried and what evidence would in fact be admitted. Mr. Piper referred to, he said, well, maybe they could rebut whatever showing we the plaintiffs might make. Or they could apply tort law standards. Or we could move this to small claims court. Those were three of the possibilities. All those three things have one thing in common. They're all individual evidence. All of those procedures that he just discussed mean we're going to look at a claim individually to determine what should be paid, what was owed and whether the payment was more or less or the same as what was required under the contract. That's an individual question. It's a jury question. It's not a damages question. The contract promises to pay an amount whether we breached it, whether we didn't breach it, whether we satisfy it. That's a liability question, not a damage question. It doesn't belong in ancillary proceedings. It's the heart of what the jury has to decide. Judge Thormer, you can inquire about assignments. I'll refer to Illinois assignment law in three respects. McHenry Hospital and the service adjustment case which we cite in our papers. And I'll also refer the court to my prior argument before you in the Lebanon case where I moved to dismiss a claim under the theory the assignment was on its face, invalid, that it expired. And the trial court said and the appellate court in the other cases I just referred to said questions about the ability of assignment are very fact-intensive. So the question about assignment, it's not merely is there a prohibition or is there some inconsistency. The question is determining whether an assignment is valid. Is that threshold question, identifying who has the claim here and whether there is a claim. Is that question in practical application, one that could be answered across the class or not? I'd submit the answer is no. It's proven by, I submit, the prior record that you have before you in the other matter. It doesn't have to be fact-intensive. They either have a written assignment or they don't have one. It is. And the question is what are its terms? And in those cases, Your Honor, it was disputed and the court said we have to hear evidence. We can't decide that. We have to look at evidence. Talk about a perfect example of unmanageability. I submit that. Some of them would, as I mentioned, some of them would just assign rights to proceeds. Other ones would assign the full cause of action. You've got to look. You've got to look, Your Honor. I want to go back to a point that's been made over and over that we didn't, Illinois Farmers, didn't look at all these various factors that the case law says are important. You know, Your Honor, it was in closing. I'm not arguing and don't argue today that you should make a decision about whether the MedData system is good or bad, whether our bill review process got it right some of the time, all of the time, or none of the time. There's no evidence, I'll submit, by the way, in front of you about the MedData system. Mr. Burke made all sorts of accusations about it. There's no evidence in the record what's wrong with it. In the record, he was talking about a bill review system we didn't use, one that was run by somebody else. So we don't know what's wrong with it in the MedData system, if anything. But I do submit this, that fundamentally whether we met our policy obligation is under the case law of this State, a question that has to be answered individually. It may be the MedData system was right some of the time, wrong some of the time, but it's a question that has to be answered with evidence, hard evidence. Judge Donovan, you can't cross-examine a postcard. And the type of trial that the Court seems to have in mind, one where the medical bill is presumed reasonable and that's the beginning and the end of the plaintiff's case, that's not a trial. As I said before, it's an execution. The Court's been patient. We thank you for your time and your courtesy. Ladies and gentlemen, thank you very much for your audience and your briefs today. We'll thank Ms. Mayer.